## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **SAMANTHA A. WEST** | § | **CIVIL ACTION NO.** |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **NORTHROP GRUMMAN SYSTEMS** | § | |
| **CORPORATION** | § | |
| *Defendant* | § | **JURY DEMAND HEREIN** |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

**NOW COMES** Plaintiff, **SAMANTHA A. WEST**, by and through undersigned counsel, for her Original Complaint against Defendant, **NORTHROP GRUMMAN SYSTEMS CORPORATION**. She hereby states as follows:

---

## JURISDICTION AND VENUE

---

1. Plaintiff brings action pursuant to the Family and Medical Leave Act of 1993 (FMLA) as it appears at 29 U.S.C. § 2601 *et seq.* and the Americans with Disabilities Act ("ADA") or 1990, as it appears at 42 U.S.C. § 12101 *et seq.*

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States; and

   b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government.

3. Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission and Louisiana Commission of Human Rights (Charge No. 461-2018-01133) on February 22, 2018. *See* Exhibit A.

4. For all claims investigated by the EEOC, the Charging Party is afforded ninety (90) days from her receipt of the Dismissal and Notice of Suit Rights to commence litigation. The EEOC issued suit rights on March 17, 2020 and counsel for the Charging Party received the suit rights on March 23, 2020. Plaintiff files her Complaint to include claims under the ADA within the ninety (90) days of receipt as afforded by law. *See* Exhibit B.

5. Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in the City of Lake Charles, Parish of Calcasieu, State of Louisiana, making this District the most appropriate for this suit.

---

## PARTIES

6. Plaintiff is a citizen of the United States and resides in the city of Moss Bluff, Parish of Calcasieu, State of Louisiana.

7. Plaintiff is disabled and, as such, is a member of a protected class.

8. Defendant, **NORTHROP GRUMMAN SYSTEMS CORPORATION** (hereinafter "Northrop Grumman"), is a corporation organized and existing under the domestic laws of the State of Delaware. Northrop Grumman is authorized to and is conducting business within the State of Louisiana, and its principal business establishment in Louisiana is located at 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

9. At all times relevant to this suit, Plaintiff worked for Defendant at its facility located at 4405 Sen. J. Bennett Johnson Ave, Lake Charles, Louisiana, which is within this judicial

district. All claims that form the basis of this complaint arose from Plaintiff's employment at the Lake Charles facility.

10. Northrop Grumman is an "employer" as defined in 29 U.S.C. § 2611(4) and is thus subject to the requirements of the Family and Medical Leave Act (FMLA). The entity employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

## FACTUAL ALLEGATIONS

11. Plaintiff sprained her ankle during a workplace accident that occurred on December 5, 2013. Due to the delay in medical diagnoses of Plaintiff's ankle injury, she developed Complex Regional Pain Syndrome ("CRPS") or Reflex Sympathetic Dystrophy ("RSD"), which is a permanent neurological disorder that causes nerves to "misfire," such that pain sensors in the brain are overstimulated and cause severe sensations of pain. As a result of her medical condition, Plaintiff's body is unable to regulate pain throughout her entire left leg, such that, without medical intervention, Plaintiff is unable to walk or stand for more than a couple of minutes at a time.

12. Plaintiff began her employment with Northrop Grumman in May 2016. At all times relevant to the instant litigation, Plaintiff was employed by Northrop Grumman as a Certified Fuel Assistant ("CSA").

13. Upon Plaintiff's hire in May 2016, Plaintiff attended one of Defendant's orientation sessions. During the orientation session, Plaintiff explicitly discussed her medical condition with her Manager and the orientation host, William "Bob" Adams (hereinafter "Adams"), the CSA Manager and Plaintiff's immediate supervisor. Plaintiff specifically explained that she has a spinal cord stimulator to help manage the pain caused by her CRPS

and that, consequently, she could not work near any x-ray machines due to potential electrical interference that could cause the stimulator to malfunction.

14. Plaintiff was originally hired on a day shift position. Accordingly, Plaintiff worked ten (10) hours per day, four (4) days per week for a total of forty (40) hours per week.

15. From Plaintiff's start date until late September 2016, Plaintiff performed the job functions of her CSA position satisfactorily and without any reprimands of any kind.

16. In late September 2016, Plaintiff's spinal cord stimulator stopped functioning, which caused Plaintiff's left ankle to swell. As a direct and immediate result, Plaintiff began experiencing severe, radiating pain.

17. As a result of the ankle swelling and pain, Plaintiff saw her family doctor on September 30, 2016, at which time he advised Plaintiff to wear a walking boot to alleviate the pressure on her foot until such a time that she could see her neurologist to replace the spinal cord stimulator. At that time, Plaintiff's physician issued Plaintiff a release for work at full duty, the only restriction being that she had to wear a walking boot until further notice.

18. Plaintiff submitted the physician's excuse to her Manager, Adams, at which time Adams took Plaintiff to the office of Human Resources Manager, Christopher Mulkovich (hereinafter "Mulkovich"). At that time, Mulkovich informed Plaintiff that it was against OSHA regulations for Plaintiff to be working on the floor in a boot and, consequently, that Plaintiff would be forced to take a medical leave of absence, despite the fact that she had been cleared to work by her physician. When Plaintiff asked to be placed in an office position, Mulkovich informed her that there was no office work or office positions available and that she would have to request a medical leave of absence.

19. Despite Mulkovich's assertion to Plaintiff that OSHA regulations precluded Plaintiff from working on the floor with a boot on her foot, Plaintiff personally witnessed several other employees walking on the floor in ankle boots, as well as casts.

20. After Mulkovich informed Plaintiff that she would have to take a medical leave of absence, Mulkovich provided Plaintiff with the Leave office number, at which time Plaintiff contacted the Leave office and followed all necessary steps. Thereafter, Plaintiff had to leave Defendant's facility and return to her home.

21. On October 7, 2016, Plaintiff received correspondence from Defendant's Human Resource Service Center containing a packet of information pertaining to a Medical Leave of Absence, under the FMLA, if eligible, for the time period of September 30, 2016 through October 6, 2016. Plaintiff completed the packet per Adams and Mulkovich's express direction.

22. On or about December 8, 2016, Plaintiff received correspondence denying her leave of absence request, or, alternatively, FMLA leave request. The Leave office informed Plaintiff that her request for a medical leave of absence had been denied because her physician cleared her for full duty work, and the denial paperwork indicated that, at that time, Plaintiff did not qualify for FMLA leave because she had not earned the number of work hours required by the statute.

23. Upon denial of Plaintiff's leave request, Defendant's Leave office instructed Plaintiff to return to Human Resources and speak to them regarding leave because the Leave office did not understand why Defendant instructed Plaintiff to take a medical leave of absence when only a physician can do so.

24. When Plaintiff met with her neurologist, Dr. Abraham Thomas, in early December 2016, Plaintiff learned that she would have to undergo surgery for the replacement of her spinal

cord stimulator battery. Dr. Thomas informed Plaintiff that, until the time of her surgery, which was set to take place on December 28, 2016, she could return to work full duty and, if Defendant would not permit her to work while wearing a boot, to return to work wearing a heavy duty ankle brace.

25. On December 5, 2016, Plaintiff delivered her physician's note and release paperwork to Adams, who instructed Plaintiff to submit the note and release directly to Mulkovich in Human Resources. When Plaintiff did as she was instructed and submitted the note to Mulkovich, other Human Resources personnel, including, but not limited to Kim Ned, expressed confusion as to why Plaintiff had ever been instructed to take a medical leave when she had been cleared to work by her physicians. At that time, Plaintiff was asked to step out of the office so that Human Resources could discuss the matter further with Adams.

26.  As Plaintiff stepped into the hallway outside of the Human Resources office, Plaintiff contacted her father, who came to the office and met her.

27. While Plaintiff and her father were speaking in the Human Resources waiting area, Adams, Kerry Pierce, the Head of Human Resources (hereinafter "Pierce"), and Mulkovitz arrived, at which time Plaintiff explained to Pierce what had occurred regarding the medical leave of absence. At that time, Pierce informed Plaintiff that she was still active in the company system, had never been put on a medical leave of absence and had effectively missed two-and-a-half months of work because Mulkovitz and Adams "illegally" put her on a medical leave of absence.

28. At the end of the conversation, Pierce instructed Plaintiff to return to work, on her normal day shift, beginning on December 8, 2016.

29. Between December 10, 2016 and December 11, 2016, Plaintiff approached one of her supervisor's Shannon LNU, and requested to work on unit 9111 because the unit was close

to the break room and her left foot was very tender. Not only did Shannon wholly disregard Plaintiff's request to be assigned to a unit that would reduce her walking distance, but Shannon assigned Plaintiff to Unit 0043, which was an aircraft located in the furthest corner from the breakroom.

30. On December 15, 2016, Plaintiff met with Mulkovitz and Adams regarding worker's compensation dress code and back pay for two-and-a-half months of work she had been forced to miss. At that time, Plaintiff was told that her attorney would have to subpoena corporate for the dress code and that the company would not be compensating her back pay. At that time, Plaintiff reiterated that it was Mulkovitz and Adams that wrongfully put her on a medical leave of absence, at which time Mulkovitz said, "you're not in here for that." Then, Mulkovitz told Plaintiff that she "didn't try hard enough to come back," and that she "should have had [her] doctor put [her] on light duty." In response, Plaintiff noted that, approximately one (1) weeks after Plaintiff was forced to take a "medical leave of absence," Defendant hired another female, Christine LNU, who could not pass the company's respirator test, which is a qualification necessary for a CSA position. Instead of refusing to hire Christine after she disqualified herself from the CSA position, Defendant created an office position for her, all of which occurred after Plaintiff had been told that there was no office work. In response, Plaintiff was instructed to "discuss it with [her] attorney."

31. On December 15, 2016, Plaintiff submitted a vacation request to Adams, wherein she requested off from December 27, 2016 through December 29, 2016. On the vacation request, Plaintiff specifically noted that she was requesting the time off for a surgery that was scheduled for December 28, 2016. Moreover, Plaintiff explained that she was requesting December 29, 2016 in order for her to travel back to Louisiana from her

neurologist's office located in Houston, Texas. Adams approved the vacation request on December 15, 2016.

32. Plaintiff returned to work following her surgery on or about December 30, 2016.

33. On January 9, 2017, a day on which Plaintiff was not scheduled to work, Plaintiff attended her post-operative appointment in Houston, Texas with neurosurgeon, Dr. Richard K. Simpson. At that time, Plaintiff relayed her belief that the surgery and battery replacement had not worked, as she was experiencing significant pain at the surgery site and in her left leg. Dr. Simpson asked Plaintiff to give the new battery a couple of additional weeks with the hope that her body would adjust to it.

34. In late January 2017, and without any explanation whatsoever, Defendant transferred Plaintiff from her day shift position to a night shift position.

35. Plaintiff immediately went to Tina LNU, the individual who replaced Adams as the CSA Manager, and informed her that, due to Plaintiff's neurological medication schedule, she needed to remain on "day shift." Tina LNU simply replied with "well, that's the schedule that you're on." Thus, while Plaintiff notified Tina LNU that her medications required her to stay on day shift and, consequently, Plaintiff requested to be moved back to day shift, Plaintiff's requests went wholly ignored and disregarded.

36. On approximately February 14, 2017, and after Plaintiff's conversation with Tina, Plaintiff went to one of Defendant's computers, which contains a link through which employees can request workplace accommodations. At that time, Plaintiff attempted to submit a request for accommodations using Defendant's internal process, selecting "job transfer" from a drop-down menu of various accommodation options. Ultimately, Plaintiff sought to be transferred out of the CSA Department, as her attempts to address her medical condition with CSA Management had proven futile. Upon Plaintiff's submission, she received an

error message, stating that she could not submit more than one (1) request and one had already been submitted.

37. At no time prior to February 2017 had Plaintiff attempted to submit a request for workplace accommodations using the Company's computer link. Accordingly, Plaintiff called approximately four (4) different individuals in an attempt to ascertain who had filed a request on her behalf and, if one had been filed, what accommodations, if any, had been requested.

38. Plaintiff received a call back from Ms. Marie Waller ("Ms. Waller"), an employee with Defendant's Workplace Accommodation Department, wherein Ms. Waller informed Plaintiff that: 1) Adams had submitted an accommodation request back in December 2016; 2) the Accommodation Department had emailed Adams several times to obtain Plaintiff's contact information in order to start the accommodation process; and 3) Adams had refused or otherwise failed to respond to all Accommodation Department emails.

39. On February 19, 2017, and pursuant to the request of Ms. Waller, Plaintiff submitted a medical leave of absence request to Defendant's Human Resources Service, accompanied by a note from her physician. Plaintiff subsequently received an email from M. Marie Waller, an employee with Defendant's Workplace Accommodations & Accessibility sector, on February 28, 2017, asking her to send the medical note in another format so she could read it more clearly. In addition, Mr. Waller informed Plaintiff that she would convene a reasonable accommodation committee to discuss a job transfer and asked Plaintiff to let her know when Plaintiff is released to return to work.

40. On February 20, 2017, Plaintiff began experiencing excruciating pain in her left leg and the surgical site, at which time she contacted her neurologist, Dr. Thomas, and informed him that the surgery had not remedied her pain. At that time, Dr. Thomas informed Plaintiff

that she would have to have the entire spinal cord stimulator system removed. Thereafter, Plaintiff's physicians submitted a request for approval of the surgery to worker's compensation, which did not approve the surgery until late May 2017.

41. As Plaintiff could not return to work after February 20, 2017, Plaintiff asked Adams what she needed to file with Defendant to protect her employment. In response, Adams directed Plaintiff to submit a request for medical leave, which Plaintiff submitted per Adams' express direction on February 28, 2017.

42. In her February 28, 2017 leave request, Plaintiff noted that she needed leave beginning on February 20, 2017 for "[her] own serious health condition or other medical inability to work." Plaintiff specifically asked Adams what she should put as the "start date" of her leave, and Adams instructed her to put her last day of work, February 20, 2017. Plaintiff did not input any "end date" on her request because Adams specifically instructed her that the end date would be deemed whatever date Plaintiff returned with a physician's note clearing her to return to work.

43. Adams deliberately told Plaintiff that her leave of absence would end when she produced a physician's note clearing her to return to work.

44. On March 7, 2017, Plaintiff received an email from Ms. Waller, informing her that the company needed more detailed information from Plaintiff's medical provider before Defendant's reasonable accommodation committee began processing her accommodation request.

45. On March 14, 2017, Plaintiff received an email from Ms. Waller requesting a signed authorization to obtain records and a copy of Plaintiff's job duties. Plaintiff completed an authorization for the release of records from Dr. Van Snider. Plaintiff then sent a picture

of the authorization via email to Ms. Waller on March 14, 2017. Plaintiff sent an email with a copy of her job duties that same day.

46. On the evening of April 3, 2017, Plaintiff exchanged text messages with Addington, her supervisor, regarding a meeting with Human Resources scheduled for the following day.

47. On April 4, 2017, Plaintiff exchanged text messages with Addington, her supervisor, reflecting that she had been to her physician's office and would subsequently be cleared to work on April 10, 2017.

48. On April 13, 2017, Plaintiff received an email from Ms. Waller, informing her that Plaintiff's medical provider had not responded to Defendant's Medical department. Therein, Plaintiff was instructed to contact her provider and request their submission of pertinent medical records.

49. On April 18, 2017, Plaintiff sent Addington, her supervisor, a copy of a letter from her physician's office indicating, among other things, "Do not work until released."

50. On May 16, 2017, Plaintiff received email correspondence from Ms. Waller, where she informed Plaintiff that: 1) Defendant held a reasonable accommodation meeting on April 27, 2017 and 2) Defendant decided to "re-convene" once Plaintiff could return to work.

51. Worker's compensation approved Plaintiff's surgery in late May 2017. The surgery was scheduled to take place and, in fact, did take place in early June 2017. Plaintiff informed Defendant, through Addington and Adams, that she would be undergoing surgery to remove the spinal cord stimulator, very shortly after she was provided with a date for the same.

52. Approximately two (2) weeks after Plaintiff underwent surgery in June 2017, Jill Duke sent a letter, dated June 23, 2017, instructing Plaintiff to contact Human Resources. According to the letter, Defendant was "under the impression" that Plaintiff had taken off

of work without notifying her supervisor of the same. Therein, Defendant informed Plaintiff that she would be terminated for job abandonment if she did not contact the company by June 28, 2017.

53. Defendant sent the June 23, 2017 letter via FedEx and delivered the same to 811 14th St., Lake Charles, Louisiana 70601. This was, at no time, Plaintiff's address of record. Rather, in her employment application with Defendant, Plaintiff noted her address as 1822 Hollis Road, Westlake, Louisiana 70669, which was known or otherwise should have been known to Duke. Moreover, following Plaintiff's termination, Defendant has sent all other correspondence, including Plaintiff's paystubs and her IRS W-2, to the Westlake, Louisiana address. Accordingly, Defendant sent the June 23, 2017 letter, wherein in stated that it would terminate Plaintiff if she failed to respond by June 28, 2017, to an address not reasonably calculated to reach Plaintiff under any circumstances.

54. In contrast to the assertion made by Defendant in its June 23, 2017 letter, Plaintiff had remained in direct communication with Scott Addington, Defendant's CSA Supervisor and, consequently, Plaintiff's immediate supervisor. Not only did Plaintiff contact Addington via telephone, but she sent him text messages on April 3, April 4, and April 18 2017. Moreover, Plaintiff physically walked in and submitted a doctor's excuse to Addington, which stated that she could not return to work until specifically released by her physician.

55. The June 23, 2017 letter was delivered to the Lake Charles address on July 1, 2017. The tenant of the Lake Charles address contacted Plaintiff's ex-boyfriend, who thereafter contacted Plaintiff that day to inform her of the letter.

56. On July 1, 2017, the very day that Plaintiff received the letter dated June 23, 2017, Plaintiff immediately attempted to contact Duke; however, Duke did not answer or return Plaintiff's

phone call. Plaintiff subsequently attempted to contact Addington; however, Addington did not answer or return Plaintiff's text messages.

57. Upon her unsuccessful attempts to contact both Duke and Addington, Plaintiff contacted Defendant's Ethics Department on July 15, 2017, at which time she was informed by representative, Patsy Wolfe, that she had been discharged from her employment effective June 30, 2017. At that time, Plaintiff filed a complaint with the Ethics Department, stating that she believed she had been discriminated against due to her illness, as she was terminated for purportedly abandoning her position at a time she was not cleared to work.

58. While Defendant purported to conduct an investigation into Plaintiff's Ethics complaint, Defendant provided no explanation of the investigatory efforts taken, and it did not provide any explanation as to why it determined Plaintiff's claims to be unsubstantiated.

---

**FIRST CAUSE OF ACTION:**
**DISABILITY OR "REGARDED AS" DISABILITY DISCRIMINATION IN EMPLOYMENT/FAILURE TO ACCOMMODATE**
*Pursuant to 42 U.S.C. § 12101 et seq.*

---

59. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

60. Title I of the ADA prohibits covered employers from discriminating against a qualified individual with a disability because of the disability with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms and conditions, and privileges of employment. 42 U.S.C. § 12112(a). Moreover, the ADA generally prohibits an employer from failing to reasonably accommodate a qualified employee's known disabilities.

61. Defendant is an "employer" as defined in 42 U.S.C. § 12111(5)(A). Defendant is engaged in an industry affecting commerce who has 15 or more employees for each working date in each of 20 or more calendar weeks in the current or preceding calendar year.

62. Plaintiff is "disabled" as defined in 42 U.S.C. § 12102(1)(A). Plaintiff suffers from Complex Regional Pain Syndrome ("CRPS") or Reflex Sympathetic Dystrophy ("RSD"), which is a permanent neurological disorder that causes nerves to "misfire," such that pain sensors in the brain are overstimulated and cause severe sensations of pain. As a result of her medical condition, Plaintiff's body is unable to regulate pain throughout her entire left leg, such that, without medical intervention, Plaintiff is unable to walk or stand for more than a couple of minutes at a time.

63. Plaintiff's Complex Regional Pain Syndrome ("CRPS") or Reflex Sympathetic Dystrophy ("RSD") substantially impairs several of Plaintiff's major life activities, including, but not limited to, thinking, concentrating, walking, standing and working.

64. At all times relevant to this suit, Plaintiff was qualified for the position of CSA, as she was specifically hired for the position by Defendant and performed the job duties exemplarily for over one (1) year. As such, with or without reasonable accommodation, Plaintiff can perform the essential functions of the CSA position.

65. After Plaintiff was instructed by her physician to wear a boot until her spinal cord stimulator could be replaced, Plaintiff returned to work, with a release to return at full duty, with a boot on her left foot. While Plaintiff could perform all of her required job duties with the assistance of the boot, which lessened the pressure on her ankle and therefore reduced the pain caused by her CRPS, Plaintiff's need for an accommodation was open, obvious and apparent.

66. Rather than permitting Plaintiff to continue working with her boot, like other employees who were permitted to work while wearing boots or casts, Defendant required Plaintiff to take two-and-a-half months off of work without compensation.

67. Rather than creating an office position for Plaintiff, Defendant required Plaintiff to take two-and-a-half months off of work without compensation. Approximately two (2) days after Plaintiff began her "leave of absence," Defendant created an office position for another woman, Christine LNU, who had disqualified herself from a CSA position upon failing the required respirator test. Thus, while Defendant readily created office work and office positions for employees who otherwise did not qualify for employment with Defendant, Defendant refused to afford Plaintiff the same accommodation and, instead, forced her to take two-and-a-half months off of work without compensation.

68. When the battery in Plaintiff's spinal cord stimulator malfunctioned, Plaintiff requested to be assigned to work stations that were closer to the break room to reduce her walking distance. Not only did her supervisor, Shannon LNU, completely disregard Plaintiff's request, but she assigned Plaintiff to work at a unit as far away from the break room as possible.

69. Following Plaintiff's first surgery on December 28, 2016, Defendant, without any justification or explanation therefore, moved Plaintiff from a day shift to a night shift position. Plaintiff immediately reported that she could not work night shifts due to her neurological medications; however, her requests to be moved back to day shift went ignored by Defendant's management.

70. After her verbal requests went unanswered, Plaintiff attempted to formally request a workplace accommodation through Defendant's internal process in February 2017. When Plaintiff attempted to do so, she learned that Adams had submitted a request on her behalf

nearly two (2) months prior and then altogether refused or otherwise failed to provide the Accommodation Division with necessary contact information to commence the accommodation process.

71. After Plaintiff submitted the requested accommodation paperwork, she was informed that the Accommodation Division would meet with her when she returned to work to arrange an accommodation. Plaintiff was terminated on June 30, 2017, before she returned to work, such that no accommodation meeting ever occurred.

72. Plaintiff requested a series of reasonable accommodations, none of which were honored or meaningfully considered by Defendant, through the acts or omissions of its agents and/or officers.

73. Defendant, through the actions and omissions of its agents and/or officers, failed to meaningfully engage in an interactive process intended to agree and implement reasonable accommodations for Plaintiff.

74. Defendant, through the actions and omissions of its agents and/or officers, failed to implement any reasonable accommodations for Plaintiff.

75. By refusing to accommodate Plaintiff's medical needs, Northrop Grumman failed to reasonably accommodate Plaintiff and took otherwise overt action against Plaintiff on the basis of her disabling conditions.

76. Plaintiff's Complex Regional Pain Syndrome ("CRPS") or Reflex Sympathetic Dystrophy ("RSD"), and accommodations Plaintiff requested as a result thereof, were a substantial, motivating factor in Defendant's decision to terminate Plaintiff.

77. Wherefore, Plaintiff asks this Honorable Court to find **NORTHROP GRUMMAN** liable for a violation of Title I of the Americans with Disabilities Act of 1990.

**SECOND CAUSE OF ACTION:**
**ADA RETALIATION**
*Pursuant to 42 U.S.C. § 12203*

78. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

79. Plaintiff requested certain workplace accommodations from Northrop Grumman. These include, but are not limited to, being permitted to work on the day shift due to accommodate the effectiveness of Plaintiff's medications and permitting Plaintiff easier access to her work area to limit her walking distance. Moreover, in February 2017, Plaintiff requested a workplace accommodation in the form of a position transfer.

80. By deliberately requesting reasonable accommodations from Defendant for her known disabling condition, the most recent being on or about February 14, 2017, Plaintiff engaged in protected activity as contemplated by the Americans with Disabilities Act.

81. Plaintiff's employment was terminated on or about June 30, 2017. Accordingly, Plaintiff was subjected to an adverse employment action.

82. Plaintiff's last day of work with Defendant was on February 20, 2017. Plaintiff was on a medical leave of absence, which came to close upon Defendant's decision to terminate Plaintiff for alleged "job abandonment," on June 30, 2017. Thus, Plaintiff was not present at work for the significant period of time between Plaintiff's formal request for a workplace accommodation on February 14, 2017 and her ultimate termination from employment on June 30, 2017.

83. Upon information and belief, prior to the unwarranted termination giving rise to this litigation, Plaintiff had not received any disciplinary action of any kind during her employment with Defendant.

84. Defendant, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the terms, conditions, and privileges of her employment in retaliation for her requesting reasonable accommodations for her known disabilities.

85. Defendant's retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

86. As a result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with her employment.

87. As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

88. Wherefore Plaintiff asks this Honorable Court to find Defendant, **NORTHROP GRUMMAN** liable for the violation of 42 U.S.C. § 12203.

---

## THIRD AND FOURTH CAUSES OF ACTION:
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT
*Interference and Retaliation*
*Pursuant to 29 USC § 2615 et eq.*

---

89. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

90. The FMLA requires covered employers to provide eligible employees with up to 12 weeks of protected, unpaid leave for certain medical situations. 29 U.S.C. § 2612(a)(1)(A).

91. The FMLA's Interference Clause prohibits employers from interfering with, restraining, or denying the exercise or the attempt to exercise, any right provided by the FMLA. 29 U.S.C. § 2615(a)(1).

92. The FMLA's Retaliation Clause prohibits employers from discriminating or retaliating against an employee for exercising her rights under the FMLA. 29 U.S.C. § 2615(a)(2).

93. Plaintiff is an "eligible employee" pursuant to 29 U.S.C. § 2611 because, at the time Plaintiff underwent a second surgery in June 2017, Plaintiff had worked for Defendant for more than twelve (12) months with at least 1,250 hours of service during the previous twelve (12) month period.

94. Defendant is an "employer" pursuant to 29 U.S.C. § 2611 because the Defendant is engaged in commerce or in any industry or activity affecting commerce who employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

95. Upon request of Adams and Mulkovich, and despite the fact that Plaintiff's physician had cleared her to work on full duty status so long as she wore a boot on her ankle, Plaintiff applied for a medical leave of absence, under the FMLA, if eligible, on or about September 30, 2016.

96. Ultimately, Plaintiff's medical leave of absence request was denied because Plaintiff's physician had cleared her to work full-duty. Moreover, Plaintiff's request for leave was also denied under the FMLA because, at the time she was forced to submit her request, Plaintiff had not satisfied the hourly requirement to become an employee eligible for FMLA leave under the statute.

97. As a result of Adams and Mulkovich's requirement that Plaintiff take a "medical leave of absence," that was disapproved by the company and did not fall under FMLA, Plaintiff was out of work for two and a half months without pay.

98. Ultimately, Plaintiff was permitted to return to work on or about December 8, 2016.

99. Plaintiff filed for a second medical leave of absence, per Adams' direction, on February 28, 2017. On her request, Plaintiff noted that she was seeking medical leave, beginning on February 20, 2017, for her own serious health condition or other inability to work. Plaintiff had readily explained that her spinal cord stimulator was not functioning properly, which was causing her left leg to swell and causing her to experience excruciating pain.

100.    Adams specifically indicated to Plaintiff that the "end date" of her leave would be whatever date she was cleared to return to work by a physician.

101.    Despite Adams' statement that Plaintiff's leave would extend until she was cleared to return to work, and despite the fact that Plaintiff specifically notified her immediate supervisor, Addington, that she had not been cleared to return to work and, subsequently, that she was having to undergo another surgery pertaining to the removal of the entire spinal cord stimulator system, Plaintiff was terminated for purported "job abandonment," at which time: 1) she had not been cleared to return to work by a physician and 2) had fulfilled the statutory requirements of the FMLA such that her leave qualified for protection under the FMLA.

102.    Plaintiff's requested leave was made temporally reasonably under the statutory requirements.

103.    Northrop Grumman interfered with Plaintiff's taking of FMLA leave by terminating Plaintiff during the pendency of such leave and, thus, by preventing her from utilizing her statutorily vested rights.

104.    Northrop Grumman retaliated against Plaintiff for taking or otherwise attempting to take leave by terminating Plaintiff under the guise of "job abandonment" while Plaintiff was taken off of work to recover from a surgery she underwent in June 2017.

105.     By virtue of its interference and retaliatory conduct, Defendant has violated 29 U.S.C. §§ 2615(a)-(b) of the FMLA.

106.     As a direct result of Defendant's interference and retaliation with Plaintiff's clear and unequivocal attempt to take protected FMLA leave for a qualifying serious health condition, Plaintiff suffered prejudice, most notably by virtue of her sudden and unexpected termination, which ultimately resulted in monetary loss.

107.     Defendant's retaliatory conduct and interference with Plaintiff's ability to exercise FMLA leave were imparted in bad faith, were intentional and willful, and were committed with reckless disregard of the established rights of Plaintiff.

108.     Defendant knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FMLA.

109.     Wherefore Plaintiff asks this Honorable Court to find Defendant, **NORTHROP GRUMMAN** liable for the violation of the anti-interference and anti-retaliation provisions of the Family and Medical Leave Act of 1994, as amended.

---

## PRAYER

---

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Punitive or exemplary damages;

(c) Liquidated damages;

(d)  Reasonable attorney's fees, with conditional awards in the event of appeal;

(e)  Pre-judgment interest at the highest rate permitted by law;

(f)  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(g)  Costs, including expert fees;

(h)  Reasonable and necessary medical care and expenses in the past and future;

(i)  Mental anguish damages in the past and future;

(j)  Injunctive relief; and

(k)  Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

### DEMAND FOR JURY TRIAL

---

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

**Respectfully Submitted**,

*/s/ Brent Hawkins*
DERRICK D. KEE (#29930)
BRENT HAWKINS (#30547)
HAWKINS KEE LAW GROUP
1417 Hodges Street
Lake Charles, LA 70601
(337) 210 - 8811 (Office)
(337) 210 – 8855 (Facsimile)

**SUDDUTH & ASSOCIATES, LLC**
Attorneys-at-Law
1109 Pithon St.
Tel: (337) 480-0101
Fax: (337) 419-0507
Email: *James@saa.legal*

**BY:** */s/James E. Sudduth, III*
**JAMES E. SUDDUTH, III, #35340**
**KOURTNEY L. KECH, #37745**
**PIERCE A. RAPIN, #38579**
*Counsel for Samantha A. West*